

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00484-CV

IN THE INTEREST OF M.A.P.,
MINOR CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants R.P., Jr. (Father) and C.H.G. (Mother) appeal the trial court's order terminating their parental rights to their son, M.A.P. (Maurice).[2] Appellants argue that the evidence is legally and factually insufficient to support the jury's verdict of termination and that the order of termination violates substantive due process. We affirm.[3]

---

[1]*See* Tex. R. App. P. 47.4.

[2]We will use "Maurice" as an alias to refer to M.A.P. throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

[3]We note that the briefs filed by the counsel for both parents contain language that is distracting and inappropriate. Appellate attorneys have an "obligation to treat with consideration all persons involved in the legal process

**Background Facts**

According to Father, in 1984, he was born addicted to marijuana because his mother used it while she was pregnant. Father was sexually abused while he was a child in California; his parents were "never married and could not stand each other." When Father was nine years old, he was diagnosed as paranoid schizophrenic, and he learned about that condition when he was fourteen years old. He has been taking various medications for his schizophrenia for many years, but the medications have not eliminated the symptoms of his mental illness. From 2008 until the spring of 2010, Father did not take medication. Sometimes as a result of his mental illness, Father has had auditory and visual hallucinations.

Mother was born in 1987 and was diagnosed as schizophrenic when she was approximately eighteen years old. Twice in 2005, she went to a state

and to avoid the infliction of harm on the appellate process, the courts, and the law itself." Texas Supreme Court, Standards for Appellate Conduct, *available at* http://www.supreme/rules/conduct.asp. Attorneys must also "serve the Court by respecting and maintaining the dignity and integrity of the appellate process." *See id.* The briefs that the parents' attorneys submitted fail to meet these standards. As examples of this failure, Mother's brief insults this court as being "closeted . . . from the facts of life lived on the ground by the common citizens." Father's brief refers to Father and Mother as "morons," labels voluntary court-appointed child advocates as "ventriloquist dummies," characterizes employees of the Department of Family and Protective Services (the Department) as "*soi-disant* saints," and states that parents who are typically involved in CPS cases are "run-of-the-mill scum" and "degenerate dregs." Both briefs also contain language expressing personal opinions or interests of the attorneys that have little relation to the law or facts of this case. Counsel should be careful to comply with all applicable appellate standards and to act with proper decorum in future representation of clients before this court.

hospital. First, in October 2005, on a day that she had been drinking alcohol and smoking marijuana, Mother went to the state hospital because she was "out of control," was crying incessantly, and was hallucinating. Mother continued to act erratically at the state hospital; for example, she paced hallways with her hands clinched in a fist while punching into the air and coming close to hitting patients and the hospital's employees. She stayed at the state hospital awhile, was discharged, stopped taking her medication, and returned around Christmas of 2005. Reports from her second trip to the state hospital recite that before her admission, she was running into a street, her mother called the police, and when Mother was taken to the state hospital, she was "belligerent, threatening[,] and very agitated." When Mother was discharged from the state hospital the second time, after a couple of months, she stopped taking her medication again, and she did not take it from 2006 through 2009. She began taking medication again sometime between January and September 2010, and she took it from then through the jury trial in November 2011. Mother completed high school and has taken some college courses. Her father has been confined for committing a sexual crime.

Father and Mother, who have never been formally married (although Father sometimes referred to Mother as his common law wife), met each other in 2007 at Faith Mission, a homeless shelter. They smoked marijuana together and had sex on the day that they met each other. They soon moved in together, and

3

shortly thereafter, Father began to physically abuse Mother; specifically, he scratched her and wrestled her.[4]

In March 2008, Mother learned that she was pregnant with Maurice. Mother had a normal pregnancy, and she attended all scheduled prenatal visits with her doctor. During the pregnancy, Father went to a "little dad's class" and "came directly on home with boxes of diapers." Mother testified that she did not smoke marijuana or drink alcohol while she was pregnant.

Maurice, who is Father's and Mother's only child, was born in Wichita Falls in October 2008, the same month that Mother and Father moved together into Indian Falls Apartments (Indian Falls), where they received housing assistance. A document entered into evidence reflects that during part of the time that Mother and Father lived at Indian Falls, the apartment needed various repairs to address dangerous conditions (for example, the City of Wichita Falls required that rusted stovetop drip pans be replaced to prevent a fire).

On the day of Maurice's birth, although Father was taking medication, he threatened to kill a doctor and to "shoot everyone" if anything negative happened to Maurice while Mother was birthing him. Father testified that he also threatened the doctor because the doctor made fun of Los Angeles. Father said to the doctor, "I would like to see you in a pool of blood." But Father testified that he was "overjoyed" upon Maurice's birth and wanted to provide for his needs.

---

[4]Mother and Father eventually lived together at three addresses.

After the hospital discharged Mother and Maurice, Father and Mother took Maurice home, but because of Father's threat at the hospital, Child Protective Services (CPS) visited Maurice. CPS representatives found Maurice to be clean and healthy. Among other topics, the representatives talked to Father about controlling his temper. CPS did not remove Maurice from his parents' custody at that time; instead, CPS representatives periodically visited Mother and Father, and the parents worked on family-based safety services (including parenting classes) until April 2009, when CPS stopped interacting with the parents. Near that time, while Maurice was in a room away from Mother and Father, they had a dispute in which Father grabbed Mother's neck, choked her, punched her in the mouth with a closed fist, and caused her lip to bleed.[5] Pursuant to his guilty plea, Father was later convicted of assaulting Mother. Mother and Father also smoked marijuana together in the months after Maurice's birth. Nonetheless, according to Mother, Maurice was healthy, happy, and progressed normally during that time.

In August 2009, authorities received a domestic disturbance call concerning Mother and Father, and CPS visited them again. Also in that month, Mother took Maurice to an emergency room demanding that he be examined because she believed that Father had molested him. The hospital refused to

---

[5]Mother testified that over the course of her relationship with Father, he choked her between one and three times, punched her at least once, and shoved her into a wall once.

5

perform a sexual abuse test, and Mother returned home. Although Mother continued to believe that Father had molested Maurice, Father resumed living with Mother and Maurice. Mother and Father continued to use drugs together.

One day in September 2009, Father and Mother began an argument near an alley. During the argument, while Mother had put Maurice, who was in his car seat, on a ledge to change his diaper, Maurice, according to Father, almost fell. Mother and Father had both been smoking marijuana around Maurice that day. When the police responded to the argument, Mother again said that Father had molested Maurice. Mother appeared to the police to be confused and disoriented. The police took her to the state hospital, and Father took Maurice to stay at Father's "church family's house." Mother eventually went from the state hospital to a crisis respite unit, and when Father and Maurice visited her there, she became angry and again accused Father of molesting Maurice.[6] Father and Maurice were escorted out. After a few days, Mother left the crisis respite unit, and she continued to accuse father of molesting Maurice. On the same day that Mother was reunited with Maurice, CPS removed him from her care, and it soon

---

[6]At trial, Mother indicated that her belief that Father was molesting Maurice was based upon her opinion that Father had sex with a gay man (although Father denied doing so), that Father had once said that he had molested his sister, and that Maurice's "bottom was always directly sitting on" the area of Father's penis when Father held him. Mother first testified that she did not still believe that Father had molested Maurice, but she later said that she did still believe that Father had molested him. Thereafter, during questioning from her counsel, Mother seemed to attribute her belief about the alleged molestation to her schizophrenia. At trial, Father testified that he had never molested Maurice and that Mother was delusional to say so. CPS ruled out any molestation.

placed him in a foster home. Father has described the day that CPS first removed Maurice as the "worst day of [his] life."

Near the time of Maurice's removal, the Department filed a petition that sought termination of the parents' rights to Maurice if reunification could not be achieved. An associate judge gave temporary conservatorship of Maurice to the Department and appointed an attorney ad litem and a guardian ad litem for him. Several days after Maurice's removal, CPS provided a family service plan to Mother and Father. The service plan required the parents to participate in counseling and to follow all recommendations made there, take a psychological evaluation and parenting classes, maintain a safe and stable home, submit to random drug screens, participate in Narcotics Anonymous (NA) meetings "at least twice a week," and comply with all court orders. The associate judge ordered the parents to comply with each requirement of the service plan.

According to Father, when CPS first removed Maurice in September 2009, Maurice was happy, healthy, and intelligent. Mother and Father visited Maurice twice per week, and Mother testified that at the end of visitation, Maurice screamed because he did not want her to leave. Mother testified that near the time of Maurice's first removal, she wanted to stay apart from Father, but a CPS caseworker encouraged her to stay with him. Mother and Father took parenting classes together from September 2009 through January 2010.

Father began counseling in September 2009 with Cheryl Polly. Polly's reports from Father's counseling reflect frustration and stress that his relationship

with Mother caused him; Polly's final report from the counseling provided in December 2009 states,

> [Father] has satisfied the number of counseling session[s] required on his family plan. It appears that he loves his child and has some insight into what is necessary to take care of this child. However, his unstable relationship with the child's mother and the resulting confusion and exacerbation of his mental disorder . . . may hinder his ability to provide for the well-being of the child.

Father also took his psychological evaluation in October 2009 from Dr. David Sabine. Dr. Sabine's report from the evaluation states, among other facts, that Father had been hospitalized eight or nine times for psychiatric reasons, that he was paranoid and evasive during the evaluation, that his IQ is in the intellectually deficient range, and that it was going to be "difficult for [him] to parent effectively given the disabling nature of his mental illness."

Mother began counseling with John Salkeld in October 2009. When Mother met with Salkeld, she said that she and Father had been involved in "numerous verbal, as well as physical altercations." Mother told Salkeld that although she had contacted the Wichita Falls Police Department about Father's alleged sexual abuse of Maurice, she had continued to reside with Father. Salkeld's conversations with Mother revealed that she began smoking marijuana when she was sixteen years old and that she still smoked it, including sometimes around Maurice. In October 2009, Salkeld and Mother spent a "great deal of time discussing how a child's formative years have a great impact on the child as they grow up," and they discussed "in detail how it is not in [Mother's] benefit or

8

[Maurice's] benefit for her to reside in the same location as [Father]." Salkeld noted in some of his later reports concerning Mother that she was attending many NA meetings. In a November 2009 report, Salkeld said that Mother had a "fair to good potential for good recovery" from her drug abuse issues. In December 2009, however, Salkeld reported that Mother was "making little effort to obtain ongoing recovery." Later in December, Salkeld wrote that Mother was having "difficulty accepting that marijuana was a big problem for her." In January 2010, Salkeld expressed his belief that Mother had "very little insight concerning the serious difficulty that she . . . brought upon herself."

In March 2010, during a dispute between Father and Mother at Indian Falls, he grabbed her throat with both hands, causing her to have difficulty breathing, and he also pulled her hair. The police arrested Father for assaulting Mother. Diane Crow, who works for Indian Falls, wrote a letter to an employee of the City of Wichita Falls that stated in part,

> [T]here was a family disturbance at [the apartment] on Wednesday, March 3, 2010. [Father] was upset about the hearing regarding getting back their son. He had been given two [drug] tests and both came back positive so the hearing was postponed . . . . He pushed and grabbed [Mother] around the neck as well as leaving other marks on her. He was arrested for family violence . . . . She requested the locks changed . . . .

After a permanency hearing in August 2010, CPS transferred possession of Maurice from the foster home back to Mother on a monitored return.[7] Upon

---

[7]*See* Tex. Fam. Code Ann. § 263.403 (West 2008).

9

being returned to Mother, Maurice stayed in day care while Mother worked on weekends and went to school on weekdays. Linda Boyd, the court-appointed special advocate (CASA) assigned to Maurice's case, who was also Maurice's guardian ad litem, helped Mother enroll Maurice in the day care. The monitored return appeared to Desiree Bernal, the CPS caseworker who was assigned to Maurice's case in August 2010, to be progressing well. The conditions of the return required Mother to notify CPS if she moved, to not use drugs, to not let Father stay in her home, to not stay in Father's home, to not allow unsupervised visitation between Father and Maurice, and to allow a caseworker to check on her and Maurice periodically. CPS allowed Mother to supervise visits between Father and Maurice but only in public places.

Despite the conditions of the monitored return and despite Mother's continued belief that Father had sexually abused Maurice, in the latter part of 2010, Father sometimes slept at Mother's residence. Around that time, Father also sometimes slept in a park. One day in the park, he became suicidal and told police officers that he was going to cut himself. The officers took him to a state hospital, and then he went to a crisis respite unit. In October 2010, a police officer arrested Father for possession of marijuana, a crime for which Father was later convicted.

One night in November 2010, three months after the monitored return had begun, Father came to Mother's apartment before 7 p.m., and according to Mother, she, Father, and Maurice listened to music before she gave Maurice a

bath and took Maurice to her room to rest. Father remained in a different room until about 1 a.m. At that time, she told Father to leave, but he said that he did not have anywhere to go. Father, Mother, and Maurice began to drive around in Mother's car. Mother testified that they began driving with the intent of taking Father home but that Father then decided that he did not want to go home. According to Father, Mother drove the car for about an hour, and then Father drove because Mother had taken medication, and Father believed that it was unsafe for Mother to continue driving.[8] After Father had started driving, a tire exploded. Father did not have a valid driver's license at the time; in fact, he has not had a driver's license since he moved to Texas from California when he was twenty-one years old. And when Father resided in California, his driver's license was suspended because he had stolen a car.

Although Father testified that he, Mother, and Maurice had been traveling in the car for two hours when the tire exploded, he said that he did not remember where they were going. Father said that when the tire exploded, Maurice was not properly buckled into a car seat, but Mother testified that Maurice was properly buckled. When the explosion occurred, Father pulled over to change the tire, and a police car pulled behind him. According to Father, the police started to interrogate him. Father admitted to possessing marijuana, said that he

---

[8]At trial, Father testified that Mother had endangered Maurice by driving after she had taken medication. Mother testified that she did not drive erratically that night. A sheriff's deputy reported that Mother appeared lethargic and incoherent, as if she was under the influence of drugs.

did not want to go to jail, and ran away. The police arrested Mother for driving while intoxicated, and because no one at the scene could care for Maurice, he returned to CPS's care and was eventually placed back in the foster home where he had stayed prior to the monitored return. When Maurice returned to his foster home, he was, according to Boyd, a "different child" compared to when he had stayed there before the monitored return; for example, his sleep was erratic, bath time was "very frightening" for him, and he did not relate well to other children in the home.

Mother spent a few days in jail after her arrest, but she was not convicted for a crime in connection with it. Boyd visited Mother in jail on the morning of the arrest, and to Boyd, Mother seemed "very, very dazed." According to Boyd, Mother said that she was on drugs and that she and Father had been to a club on the previous night. Because Father had left a form of identification, the police were able to find him later that morning at Indian Falls, although he had already been barred from there because of his abuse of Mother. Father ran from the police again at Indian Falls, but they caught him and arrested him; he was eventually convicted of two counts of evading arrest. Father recognized that his presence at Indian Falls risked Mother's and Maurice's being kicked out of Mother's apartment.

Like Boyd, Bernal also visited Mother in jail, and Mother told Bernal that she had not been taking her medication. According to Bernal, when the monitored return was disrupted, CPS gave Mother "60 days to get back on her

meds and stabilize." Mother was ordered to continue working on her service plan, but although CPS would have paid for Mother to continue counseling, she failed to do so. Mother also did not go to all of the NA meetings that CPS had advised her to attend after Maurice's second removal. In December 2010, another employee of Indian Falls wrote a letter to the city stating,

> We at Indian Falls believe that [Mother] . . . has an unauthorized occupant living in her apartment. We have witnessed [Father] coming and going from her apartment daily, even though he has been barred from this property. We have had him arrested on one occasion and the police had to chase him through the community in order to detain him.

After Maurice returned to the foster home, the associate judge entered an order in which she found that Mother was not able to provide Maurice with a safe environment, and the judge ordered Mother to restart her "mental health treatment and medications immediately." Mother and Father began visiting Maurice together again, and Mother believed that Maurice was confused about what was happening. At some later point, the trial court ordered that Father and Mother visit Maurice separately. In January 2011, after Mother had been riding in a car with Father, she was arrested for possessing marijuana in her shoe and in her pocket; she later pled guilty for that offense and was placed on deferred adjudication community supervision. Mother and Father signed a lease and began to live with each other again in early 2011.

Father physically abused Mother in March 2011, and she went to First Step, a women's shelter. Mother testified that she "parted ways" with Father that

13

month and that she had no contact with him after March 28, 2011. But in April 2011, according to Bernal, Mother and Father admitted to her that they were still living together but were telling people that they were not a couple "so that [Mother] could get [Maurice] back." Also, Brooke McLemore, a case supervisor with CASA, testified that although Mother had told her in March 2011 that her relationship with Father was over, on April 1, 2011, McLemore saw Mother and Father holding hands while walking together.

Also in April 2011, while Mother was "catching a bus," she met a man known as "Cali," whose real name is Marcus Jackson. Mother denied dating Cali and described him as a "male associate," but she admitted that she had sex with him. Cali appeared to Mother to be homeless. One night just a couple of months before the jury trial, after Mother had let Cali stay in her apartment (although she claimed to have not known him well and to have not trusted him), he stole Mother's car.[9] During part of the summer of 2011, Father stayed at Faith Mission, the homeless shelter, but he was eventually barred from remaining there because of a threatening note that the shelter attributed to him.

---

[9]It is clear that Mother lied during part of her testimony about Cali. Mother initially testified that she did not know Cali's real name and that Cali had never been to her home. She later admitted that she knew that Cali's real name was Marcus Jackson, and she conceded that he had been to her home.

14

The jury trial of the Department's termination petition occurred in November 2011, when Maurice was three years old.[10] Father did not appear for voir dire of the jury panel on the first day of the trial; he said later that he had gone to see a doctor because he had strep throat. He was also not present for other parts of the trial, and during the middle of the trial, based on a conversation that a sheriff's deputy had with him, the deputy took him to the crisis respite unit. At the end of the trial, the jury terminated both parents' rights to Maurice. The trial court entered an order of termination on the grounds described in the jury charge. The parents brought this appeal.

## Legal and Factual Sufficiency

Mother and Father challenge various aspects of the jury's termination verdict on grounds of evidentiary sufficiency. In accordance with the jury's implicit findings included within the broad-form verdict of termination, the trial court found in its termination order that each parent had knowingly placed or knowingly allowed Maurice to remain in conditions or surroundings that

---

[10]The associate judge presided over a trial on the termination issue in May 2011. After the trial concluded, and after the statutory dismissal date had passed, the judge ordered a second monitored return of Maurice to Mother. We held that this order was an abuse of discretion, and we therefore conditionally granted a writ of mandamus. *See In re Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 492, 494, 498 (Tex. App.—Fort Worth 2011, orig. proceeding). After our decision, the associate judge, based on the evidence presented in the May 2011 bench trial, decided to return Maurice to Mother, name her as Maurice's managing conservator, and designate Father as Maurice's possessory conservator. The Department obtained a jury trial de novo in the county court at law. *See* Tex. Fam. Code Ann. § 201.015 (West Supp. 2011).

endangered his physical or emotional well-being, each parent had engaged in conduct or had knowingly placed Maurice with persons who engaged in conduct that endangered his physical or emotional well-being, and termination of the parents' rights is in Maurice's best interest.

**Standard of review and applicable law**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground

16

listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in

the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the jury's verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see also In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on witnesses' credibility), *cert. denied*, 541 U.S. 1043 (2004). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the grounds for termination. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Mother's endangerment of Maurice**

In Mother's first two issues, she argues that the evidence is legally and factually insufficient to sustain the grounds for termination under section 161.001(1)(D) and (E) of the family code. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Under subsection (E), termination may be supported by a finding that a parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. *Id.* § 161.001(1)(E).

18

As we have recently explained,

> Endangerment means to expose to loss or injury, to jeopardize. Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's . . . well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act. Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury.* The specific danger to the child's well-being may be inferred from parental misconduct standing alone. Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth.

*In re M.E.-M.N.*, 342 S.W.3d 254, 261–62 (Tex. App.—Fort Worth 2011, pet. denied) (emphasis added) (citations omitted).

The evidence disclosed a pattern of Mother's conduct by which the jury could have reasonably formed a firm belief or conviction that she had endangered Maurice's physical or emotional well-being. For example, Mother's and Father's testimony established that Mother had used marijuana around Maurice during his infancy, before his initial removal from her custody. In fact, according to Father, Mother had been using marijuana near the time in September 2009 when she walked away from Maurice, who was less than a year old, while his car seat was perched on a ledge. Father testified that during that incident, Maurice almost fell, and Father therefore opined that Mother had endangered Maurice's physical safety. Father said that although he had tried to

19

reach Maurice on the ledge, Mother had blocked him from doing so. Although Mother testified that Maurice was never in danger of falling off the ledge, the jury had the discretion to believe Father and to disbelieve Mother, whose credibility was impaired by the fact that she lied during her testimony. *See In re R.W.*, 129 S.W.3d 732, 742–43 (Tex. App.—Fort Worth 2004, pet. denied). Thus, the jury could have found that Mother had endangered Maurice's physical well-being by leaving him on the ledge. *See* Tex. Fam. Code Ann. § 161.001(1)(E).

Bernal testified that parents' drug use may impair their judgment, resulting in harm to the child. Mother agreed that using drugs around a child endangers the child. Thus, the jury could have also considered Mother's drug use before Maurice's initial removal as a factor supporting termination under the standard of section 161.001(1)(E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics . . . may qualify as an endangering course of conduct."); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Mother continued to possess and use marijuana after the Department became involved in Maurice's life, when she knew that doing so exacerbated her schizophrenia and risked the chances of her reunification with Maurice. Also, Father testified that during the time of the monitored return, Mother had allowed him to use marijuana around her and Maurice. We have held that a "parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-

20

being." *In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.).

Next, at least until March 2011, Mother continued to associate with Father despite his repeated violence toward her, including some incidents that occurred in front of Maurice. Mother acknowledged at trial that Maurice had likely heard the sounds associated with her pain and Father's anger. She agreed that children who are subjected to domestic violence in the home are endangered, and she said that she had learned from parenting classes that a single-parent home without domestic violence is better than a two-parent home where such violence occurs. She also admitted that a child's seeing domestic violence within the child's home can irreparably harm the child and that she had failed to protect Maurice from that type of harm. Therefore, although we recognize that under the evidence presented at trial, Father has the greatest culpability for the violence itself, we conclude that the jury could have reasonably determined that Mother's failure to remove herself and Maurice from the violence endangered his physical or emotional well-being. *See In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (considering the fact that a mother "exposed her children to domestic violence," including an incident where the mother was "smacked" in front of her child, as evidence of endangerment under subsection (E)); *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App—Fort Worth 2004, no pet.) (explaining that "[a]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or

emotional well-being of a child"); *see also Sylvia M. v. Dallas Cnty. Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering, as evidence supporting termination, a mother's reconciliation with her abusive spouse).

Also, the jury could have reasonably found that the November 2010 early-morning driving incident endangered Maurice in two ways. First, according to Father's account of that incident, before the tire exploded, Mother was swerving, which endangered herself, Father, and Maurice. Father testified that Maurice was not properly buckled into his car seat while they were driving. *Cf. In re M.J.F.*, No. 06-05-00113-CV, 2006 WL 2522200, at *11 (Tex. App.—Texarkana Sept. 1, 2006, no pet.) (mem. op.) (considering a parent's decision to drive a child while the parent was intoxicated and without putting the child in a properly adjusted car seat as factors supporting termination under section 161.001(1)(E)). Second, the parents' conduct related to that incident precipitated the end of the monitored return and the return of Maurice to his foster home. Thus, the jury could have reasonably found that Mother's conduct on the night of the incident caused instability to Maurice; Mother admitted this fact during her testimony. S*ee S.D.*, 980 S.W.2d at 763 (explaining that conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child).

The evidence also showed that for part of the time that Mother possessed Maurice, she did not take the medication that was prescribed for her

schizophrenia.  Based on the evidence concerning the kinds of actions that Mother engaged in as far back as 2005 when she did not take her medication, some of which we have described above, the jury could have concluded that Mother's failure to take it after giving birth to Maurice endangered him.  *See In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) ("[T]he trial court could have chosen to believe that Mother's . . . failure to . . . take steps to treat her mental health issues demonstrated an inability to provide [the child] with a safe environment.").

Under the standards of review set forth above, we conclude that these facts, among others, could have enabled the jury to reasonably form a firm conviction or belief that Mother had engaged in conduct or knowingly placed Maurice with persons who engaged in conduct that endangered his physical or emotional well-being.  We disagree with Mother's counsel's inflammatory contention that the "Department's allegations . . . are the product of the fevered imagination of the professional hysterics of the Department."  We therefore hold that the evidence is legally and factually sufficient to sustain the jury's termination verdict against Mother to the extent that the verdict rests on the ground for termination described by section 161.001(1)(E), and we overrule Mother's second issue.  *See* Tex. Fam. Code Ann. § 161.001(1)(E).  Because one finding under section 161.001(1), along with a finding that termination is in the child's best interest, is sufficient to sustain an order of termination, we decline to address Mother's first issue, which challenges the sufficiency of the evidence to

prove the ground for termination under section 161.001(1)(D).  *See* Tex. R. App. P. 47.1; *In re Z.C.*, 280 S.W.3d 470, 475 n.22 (Tex. App.—Fort Worth 2009, pet. denied).

**The best interest of Maurice**

In Mother's third issue and in Father's second issue, they argue that the evidence is legally and factually insufficient to prove that termination of their parental rights is in Maurice's best interest.  *See* Tex. Fam. Code Ann. § 161.001(2).  There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.

24

1976) (citations omitted).  These factors are not exhaustive, and some listed factors may be inapplicable to some cases.  *C.H.*, 89 S.W.3d at 27.

A factfinder may consider a parent's continuing use of illegal drugs as a factor affecting the best interest of a child.  *See M.R.*, 243 S.W.3d at 820; *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.).  Exposure of a child to domestic violence is also a relevant factor in discerning the child's best interest.  *See R.R.*, 294 S.W.3d at 235; *M.R.*, 243 S.W.3d at 820.   While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows the parent to engage in conduct that endangers the physical or emotional well-being of the child, "that conduct has bearing on the advisability of terminating the parent's rights."  *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ).  A parent's noncompliance with a service plan may also affect a factfinder's consideration of the child's best interest.  *M.R.*, 243 S.W.3d at 821; *see also In re K.S.*, No. 02-09-00331-CV, 2010 WL 2432012, at *8 (Tex. App.—Fort Worth June 17, 2010, no pet.) (mem. op.) (noting that a mother had been "unwilling to cooperate with CPS and undertake the services that would return [the child] to her").  Finally, a parent's extensive criminal record reflects on the best interest of the child in maintaining a relationship with that parent.  *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc).

**Maurice's desire, the parental abilities of the individuals seeking custody, the plans for Maurice by those individuals, and the stability of the home or proposed placement**

Maurice did not testify about his desire to continue or terminate his relationship with his parents. Father testified that he had attended every visit with Maurice, described the visits as "special," and said that he loves Maurice with all of his heart. But Boyd testified that during the parents' visits with Maurice after the monitored return ended, Maurice would sometimes scream, cry, and have to be comforted by CPS workers, who were strangers to him, because he wanted to get away from Mother and Father. Boyd said that she had watched approximately fifteen visits between Maurice and his parents. She explained that there was "not much warmth" between Maurice and Mother and that Mother seemed to be "preoccupied" and "detached from the situation at times." Specifically, Boyd testified that during the visits, Mother would send text messages on her cell phone, which diverted her attention away from Maurice. Although Boyd, who is a retired teacher of young children, attempted to model behaviors for Mother during the visits such as singing songs or reading books to Maurice, according to Boyd, Mother said that she did not want to do these things because Maurice would "want [her] to do it all the time, and [she did not] have time for that." Boyd said that Father was more involved with Maurice in the visits and played with him.

Mother knew what Maurice needed nutritionally. Bernal testified that during Mother's visits with Maurice, she sometimes brought him snacks, sang to

him, and played with him. But Bernal testified that Mother did not "redirect [Maurice] well" and had difficulty consoling him. Thus, Bernal believed that at least in part, Mother had not applied what she had learned in parenting classes and had therefore violated the service plan. Like Boyd, Bernal also testified that Maurice's visits with the parents in 2011 often did not go well. She explained,

> [W]hen [Maurice] comes to the visits, he's generally -- probably 85 percent of the time, he's upset. He doesn't want to be there. He sometimes doesn't want to go to [Mother], and it makes it difficult for those visitations to start out happy and go. It takes time to get him calmed down to visit with her.

Bernal also said that Mother could not comfort Maurice when he became upset. Boyd said that when she met with Mother at times when Maurice was outside of Mother's custody, Mother never asked her how Maurice was doing.

In contrast, Maurice was "thriving" in his foster home at the time of the trial. Maurice had lived in that home from December 2009 until August 2010, when CPS gave Maurice to Mother on the monitored return, and from November 2010 until the trial in November 2011. In other words, Maurice had lived in the foster home for twenty of the twenty-three months preceding the trial. He did not have learning disabilities, and he was developing normally except for a speech delay, for which he was receiving therapy. He had bonded with the people in his foster home. Maurice's foster family wanted to adopt him, and CPS shared that goal. Although Mother and Father had submitted names of people to be considered for placement, Bernal testified that for various reasons, those people could not appropriately care for Maurice.

27

The foster home where Maurice was living was neat and clean. Maurice's foster mother owns a day care that had a "happy bunch of kids" and was well organized. When Boyd was asked why it would not be in Maurice's best interest to remain in the foster home but allow the parents to continue to visit him, she said,

> You know, [Maurice] is three years old. He has been . . . under CPS care all but about four months of his life. He's been pulled and tugged between visitations. Some visitations have been mild. Some visitations have been heated. . . . He has been having many -- he cries a lot or it's just not a happy child. [Maurice] deserves some stability in his life, and he has it where he is. And he also has a great support system. And he is thriving.

Father testified that he preferred Maurice to live with Mother without any intervention from the Department, and he believed that Mother, whom he testified that he had not seen in several months preceding the trial, would be a good parent to Maurice. Father admitted, however, that he hoped to reunite with Mother because he still loves her. Mother testified that she did not want to be with Father, and she recognized that her relationship with him was "unhealthy." At the time of the trial, however, Mother and Father still lived within walking distance of each other. And as we explained above, although Mother testified that she had no contact with Father after March 28, 2011, other evidence contradicts that claim.

Records from Mother's parenting classes in August 2010, during the monitored return, indicate that Mother and Maurice had a bond at that time. Mother said that if the jury would permit Maurice to live with her again, she would

28

stay away from Father, enroll Maurice in "some type of school," and allow a third party to supervise visits with Father as long as Father's rights to Maurice were not terminated. But Mother said that if the jury terminated Father's rights and allowed Maurice to live with her, she would not allow Father to be involved in Maurice's life. Mother said that she loved Maurice, wanted what was best for him, and believed that it was not in his best interest for her rights to be terminated. Although Mother described Father at trial as a "great father" and said that she did not want his rights to Maurice to be terminated, she conceded that a great father does not abuse his child's mother or smoke marijuana around his child.

During questioning of Mother by Maurice's attorney ad litem about Mother's plans for Maurice, the following exchange occurred:

> Q Do you think that if [Maurice] were to be returned to you, you would suddenly turn over a new leaf and start living your entire life completely differently and never make the same mistakes that you've been making?
>
> A I sure hope so.
>
> Q But you can't tell this jury for a fact that you will, can you?
>
> A I'm not a fortune reader. Only thing I can say is live and learn.

When Bernal was asked what she believed would happen if the jury decided to return Maurice to Mother, she said, "[H]e could get hurt, but maybe have some emotional issues that, you know, come along with the fighting and the drug use. And I believe he'll probably end up back in CPS care."

29

Father, who has been on social security "[a]ll [his] life" and receives $606 per month from it, said that for a couple of weeks preceding the trial, he had worked for a temp agency that sent him to do janitorial work at schools.[11] In those two weeks, he made about $200. During the course of the Department's case, Father also painted houses and worked at Popeye's, but he testified that he left the job at Popeye's because he was being treated unfairly. Father also once worked for the City of Wichita Falls, but he lost that job because he had failed a drug test. At the time of the trial, Father was receiving free medication from MHMR and Medicaid, and he also received $200 per month in food stamps. Father's goal was to "get off Social Security." Although Father said that he had saved more than $300 in a coffee can, he admitted that he was behind on his rent and that he owed money to a bail bondsman.

In the eleven months immediately preceding the trial, Mother had lived at five different addresses. At the time of the trial, she had been working for McDonald's as a cashier for over six months. She was working forty hours per week and making $7.25 per hour. She also received social security because of her mental illness, was on Medicaid to pay for her prescriptions, bought food with food stamps and her own money, and among other expenses, paid $350 per month for rent and $60 per month for a cell phone plan.

_____

[11]At one time, Mother was the payee on Father's social security checks.

30

**Maurice's emotional and physical needs, the emotional and physical danger to him now and in the future, the acts or omissions of the parents that may indicate that the existing parent-child relationships are not proper, excuses for the acts or omissions of the parents, and programs of which the parents failed to take full advantage**

Father has a long history of criminal and violent threats and conduct. He admitted at trial that he had "anger issues" and that he became angry at Mother often, but he provided inconsistent testimony about his abuse toward Mother.[12] He initially denied being abusive toward her, then he admitted hitting her while she was pregnant, and then he denied hitting her while she was pregnant. Later, he admitted that after Maurice's birth, with Maurice in the same room, he had punched, pushed, and choked Mother and had thrown things at her, but he could not remember how many times he had done so. Father said that his assault of Mother that led to his conviction occurred when he was not taking his medication. He testified that although Mother once threw things at him, she never hit him. The following colloquy occurred during Father's cross-examination by Maurice's attorney ad litem:

> Q When you get angered like this and you fly off the handle and you do things like putting your arms around [Mother's] neck and squeezing her neck and things like that, do you agree with me that you're probably out of control?
>
> A Yes, ma'am.

---

[12]An August 2009 "Assessment Referral Form" from an MHMR center noted that Father reported having "extreme" anger and said that he had previously used oxycontin, ecstasy, and marijuana. Later MHMR records indicate that Father was not compliant with treatment that had been recommended by MHMR officials.

*Q Is that somebody who needs to be around a small child?*

*. . . .*

*A No.* [Emphasis added.]

Father smoked marijuana during the time that he lived with Mother and Maurice, and he conceded that doing so made his mental illness worse and "enraged" him. Father could not recall how many times he had been arrested, but documents proved that in Texas alone, apart from his conviction for assaulting Mother, he had also been convicted twice for evading arrest and once for possessing marijuana. According to reports from psychological evaluations, when Father lived in California, he was charged with grand theft auto along with multiple counts of burglary and robbery. A document admitted into evidence indicates that in 2007, Father threatened to cut someone with a razor blade (although Mother testified that Father had rarely acted upon threats that he had made). Father once told his psychiatrist that when he held power tools, he imagined stabbing them into people's chests and using them to chop up people. According to Mother, however, Father was never aggressive or violent toward Maurice, and Father cared for Maurice by changing his diapers, feeding him, bathing him, and playing with him.

Before and after Mother met Father, she was in other physically abusive relationships with boyfriends. In fact, Mother was hit by her first three boyfriends, including Father. Mother testified that she went to First Step, a shelter for victims of family violence, in March 2011. Myra Gideon, who works at First Step,

testified that Mother stayed at the shelter for a month in the spring of 2011 and that since that time, Mother had obtained skills to avoid abusive relationships and had become serious about wanting to change her life. As part of First Step, during intermittent parts of 2011, Mother attended support groups about creating healthy boundaries and exiting the cycle of abuse, and Mother also attended individual counseling. Mother testified that she had learned from the counseling that she does not need a romantic relationship and that if she ever enters into another abusive relationship, she should get out of the relationship as soon as possible. Mother testified that she planned to continue counseling at First Step.

Mother told Gideon that Mother wanted to end her relationship with Father, and Gideon believed that the relationship ended when Mother came to First Step. Gideon initially expressed her belief that Mother had been "very careful" about her relationship with Cali, but Gideon later conceded that Mother had made a series of unsafe choices with respect to Cali and had not fully disclosed the details of those choices, which concerned Gideon. Gideon characterized Mother's relationship with Cali as a "lapse in judgment" and a "setback"; she admitted that Mother had exercised poor judgment by allowing Cali to remain in her home after having attended group sessions for months at First Step. The following exchange occurred during questioning of Mother by Maurice's attorney ad litem concerning Mother's relationship with Cali:

> Q . . . So after all these months of domestic violence counseling, you're going to be able to take [Maurice] home and keep him safe from a possible abuse situation, right?

A  Yes.

Q  But in September, just a few short months ago, you couldn't do it, right?

A  Correct.

Mother testified that she no longer had a relationship with Cali.  She explained that she would not have let Cali into her apartment if Maurice had been there.

Gideon and Mother last met with each other a week before the trial began; Gideon testified that First Step would continue to be a resource for Mother in the future.  But Gideon conceded that Mother had not established that she could maintain a healthy relationship with a male.  Gideon said that Mother never told her that she had held hands with Father after attending First Step.

Gideon, who received a master's degree in counseling in 2007 and has worked as a social worker for approximately thirty years, testified, "I know that it does harm a child to be in a home where abuse is going on."  Gideon also recognized that many men who abuse women were children who saw their fathers abuse their mothers.  Gideon testified that even a two-year-old child could become insecure and fearful by witnessing domestic abuse in a home.

Father testified that he had previously been a member of a gang in California, and he conceded that he once made money "hustling and dealing" drugs as part of the gang.[13]  Although he said that he had left the gang and did

---

[13]Father also sold drugs after moving to Wichita Falls.

not associate with people in the gang, he admitted that he had continued to wear colors of the gang and did not wear colors of a rival gang.

Mother conceded that in October 2010, during the monitored return, Maurice's attorney ad litem told her that she needed to avoid being around Father to keep Maurice in her home, and Mother agreed that the attorney told her that she would need to make a choice between being with Father and having possession of Maurice. But as we explained above, Mother was arrested after being with Father in the same car on an early morning in November 2010, and according to Father's mental health worker, Mother was fully nude when the worker visited Father at his residence in December 2010 (although Mother testified that the worker lied about this event). Mother and Father also associated with each other at other times after December 2010.

The evidence revealed many details, in addition to the facts recited above, about the parents' abuse of marijuana and their failure to fully comply with the treatment that CPS had recommended relating to that abuse. At one time, Father smoked marijuana "[e]very day." Father first testified that he last smoked marijuana six months before the termination trial, but he later said that he had used marijuana two months before the trial, and he also admitted that he had refused to take a drug test a month before the trial because he was "too tired." Father recognized that he had made a bad decision by smoking marijuana around Maurice.

35

At trial, Mother described herself as a "recovering addict" of marijuana and said that she had used it since she was sixteen years old. She testified that she used marijuana to cope with the symptoms of her mental illness. Mother testified that she did not use drugs from September 2009 until January 2011, when she relapsed.[14] But Bernal testified that she had "concerns" about the results of drug tests that Mother took in November 2010, December 2010, and March 2011, although she did not have concerns about a test that Mother took in June 2011. Mother testified that she had last smoked marijuana in March 2011 and that she had never used a different illegal drug. Like Father, however, Mother conceded that she had refused to take a drug test a month before the trial.[15]

Although Mother had been ordered in 2009 to attend NA two times per week, she did not always do so, and she therefore violated the service plan. Salkeld emphasized at every counseling appointment that Mother should prioritize attending those meetings. Although by the time of the trial, Mother had attended more than a hundred NA meetings over the course of two years, she described herself as still being on step one of the program. Mother conceded

---

[14]In fact, Mother was arrested for possessing marijuana in January 2011.

[15]A factfinder may reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (citing *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.)). Although Mother refused to take a urinalysis test a month before the trial, she offered to take swab and hair follicle tests.

that she was not working on progressing through the program but was attending meetings because the court had ordered her to do so.

Mother met with Salkeld on a regular basis from October 2009 to November 2010. The reports from Salkeld's counseling discuss, among other topics, Mother's participation in NA, Salkeld's recommendation that Mother attend as many NA meetings as possible, and Salkeld's belief that Mother's drug recovery was the primary issue in her life. A report from Salkeld in January 2010 stated that Mother had a "tendency to provide 'lip service' to those who are involved with her recovery efforts." In a February 2010 report, Salkeld wrote, "At this time, [Mother's] long-term recovery is very questionable as she continues to 'believe' that the use of marijuana is and has been a minor issue." In April 2010, Salkeld noted that Mother was progressing through the steps of recovery, and he opined that Mother's potential for recovery was improving. In May 2010, Salkeld reported that Mother had decided to take a "vacation" from NA sessions and that he had encouraged her to return to them because they were a "big part of her ongoing recovery." Salkeld counseled Mother and Father together a few times in July 2010;[16] he described in one report that Mother was learning the steps of recovery for her drug abuse, and he opined in another report from that month that with more therapy, Mother and Father had "good potential to be good

---

[16]Bernal testified that although she had encouraged Mother to not be with Father, CPS initially arranged for the parents to attend services together because if "[they were] going to be a couple . . ., they ha[d] to learn to work through the issues that they ha[d]."

37

parents." In September 2010, after the monitored return had started, Salkeld noted that the parents were not consistently attending NA and that Father was not financially helping Mother support Maurice. Finally, in November 2010, just before Maurice's second removal from Mother's care, Salkeld wrote that Mother had not been involved in a recovery program and that "neither parent [knew] adequate parenting skills."

From September 2009 until October 2011, Father went to over sixty NA meetings. He initially testified that after a year of attending the meetings, he was still on the first step of the program, but later, he said that he was "working on Step 6." Father also attended counseling twice with someone at Madden Consulting, but Father stopped going there because he became angry when the counselor asked him about his childhood and wanted to use role playing as a method of treatment.

Father received a psychological evaluation from Dr. Sabine in October 2009. In Dr. Sabine's written report from the evaluation, he noted that Father was "hospitalized eight or nine times as a child for psychiatric reasons"; that Father was paranoid, nervous, and evasive during the evaluation; and that Father's IQ was in the "intellectually deficient range." Dr. Sabine concluded the report by stating,

> It is going to be difficult for this patient to parent effectively given the disabling nature of his mental illness. This is indeed sad because he appears to be very interested in the needs of his child, but in my view, he just does not have the requisite abilities to consistently care for the child.

Father also regularly participated in counseling with Polly. Polly opined in one report that Father wanted what was best for Maurice. Other reports indicated that Father was indecisive and stressed about the future of his relationship with Mother. Polly's report from Father's December 2009 counseling sessions states in part,

> It appears that [Father] loves his child and has some insight into what is necessary to take care of this child. However, his unstable relationship with the child's mother and the resulting confusion and exacerbation of his mental disorder . . . may hinder his ability to provide for the well-being of the child. If the child is returned to the home this counselor recommends significant oversight of these parents.

Mother also received a psychological evaluation from Dr. Sabine. When Mother met Dr. Sabine, however, he was not able to reach a result from the evaluation because he concluded that she was not answering questions honestly and fully.

Mother agreed that someone at MHMR told her that marijuana had poor effects on people who are schizophrenic. She also conceded that she had stopped taking the medication for her schizophrenia at times in the past because she did not like those drugs' side effects. Mother represented, however, that she had been taking the medication for her mental illness during the year preceding the trial and that she would continue taking it.

Documentary evidence indicates that as late as October 2010, Father had suicidal thoughts. To alleviate his paranoid schizophrenia, Father needed to take medication. But when Mother delivered Maurice, Father did not have a doctor

and was not taking medication. Father testified that the dosage of the medication that he was taking at the time of the trial was too high.

**The propriety of the jury's implicit determination of Maurice's best interest**

Considering all of the evidence under the *Holley* factors, we hold that the jury could have reasonably formed a firm conviction or belief that termination of each parent's rights is in Maurice's best interest. As to Father, the jury could have formed a firm belief or conviction that termination is in Maurice's best interest because, among other reasons, Father had failed to consistently receive appropriate treatment for his schizophrenia, had shown a propensity for violent threats and acts, had exposed Maurice to family violence, had used marijuana around Maurice and was still using it near the trial, had committed several crimes before and after Maurice's birth, and had seemed to lack a bond with Maurice during visits after the end of the monitored return. Similarly, concerning Mother, the jury could have formed a firm belief or conviction that termination is in Maurice's best interest because, among other reasons, she had failed to remove Maurice from exposure to family violence, had used marijuana around him and had continued to use it during most of the Department's case (when she knew that doing so risked her reunification with him), had failed to consistently receive appropriate treatment for her use of marijuana or her mental illness throughout the Department's case, had been evasive or misleading in counseling, had allowed Maurice to remain in a home with someone whom she believed was

40

sexually abusing him, had risked his removal from her care by associating with Father after receiving instructions not to, had not demonstrated a bond with Maurice during visits after the end of the monitored return, had continued to make poor decisions regarding her personal associations until shortly before the trial began, and had not maintained a stable residence in the year preceding the trial. Finally, with respect to both parents, in addition to the factors explained above, the jury could have determined that termination is in Maurice's best interest because he was residing in a safe foster home, was thriving there, was bonded to the home's residents, and had the opportunity to have his future permanently stabilized through adoption.

For all of these reasons, applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the jury's determination that termination of each parent's rights is in Maurice's best interest. We therefore overrule Mother's third issue and Father's second issue.

**Substantive Due Process**

In Father's first issue, he argues that the jury's verdict violates his right of substantive due process.[17] *See Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 659 (Tex. 2004) (explaining that substantive due process protects against the arbitrary and oppressive exercise of

---

[17]Mother does not raise substantive due process as an independent issue, but in a footnote, she states that she agrees with Father's brief on substantive due process.

41

government power).  The argument in Father's first issue recasts the argument in his second issue:  that under the evidence in this case, termination was inappropriate and arbitrary.  We have rejected that argument.  Assuming that Father's issue about substantive due process may be construed to relate to something other than evidentiary sufficiency, because Father did not assert a violation of substantive due process at trial, he waived that issue for appeal.  *See* Tex. R. App. P. 33.1(a)(1); *L.M.I.,* 119 S.W.3d at 710–11; *In re U.P.*, 105 S.W.3d 222, 237 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Swinney v. Mosher,* 830 S.W.2d 187, 196–97 (Tex. App.—Fort Worth 1992, writ denied).  We overrule Father's first issue.

## Conclusion

Having overruled all of the parents' issues necessary for disposition, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

GARDNER, J., concurs without opinion.

DELIVERED:  June 7, 2012

42